# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **GARY A. LILLY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00008 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | United States District Judge |
| **SECURITY,** [1] | ) | |
| | ) | |
| Defendant. | ) | |

*Gregory R. Herrell, Arrington Schelin & Herrell, P.C., Bristol, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Tara A. Czekaj, Assistant Regional Counsel, and Allyson Jozwik, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the decision of the Commissioner.

I

Plaintiff Gary A. Lilly filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits and supplemental security income pursuant to Titles II

---

[1] Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Fed. R. Civil P. 25(d).

and XVI, respectively, of the Social Security Act (the "Act"), 42 U.S.C.A. §§ 401-34, 1381-83f (West 2012).  Jurisdiction of this court exists under 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Lilly protectively applied for benefits on July 21, 2008, alleging disability beginning March 6, 2008.  He met the insured status requirements through March 31, 2013.  His claim was denied initially and upon reconsideration.  A hearing was held before an administrative law judge ("ALJ") on June 8, 2010, at which Lilly, represented by counsel, and a vocational expert ("VE") testified.  On June 23, 2010, the ALJ issued a decision finding that Lilly could perform a limited range of light work with certain restrictions and thus was not disabled under the Act.  Lilly requested review by the Social Security Administration's Appeals Council.  The Appeals Council denied his request for review, thereby making the ALJ's decision the final decision of the Commissioner.  Lilly then filed his Complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been briefed.  The case is now ripe for decision.

II

Lilly claims disability based on degenerative disc disease, Graves' disease, headaches, depression, and anxiety.  He is a high school graduate and previously

worked as a painter, powder coater, sealant mixer, and shipping clerk. He was 45 years old on the date of the ALJ's decision, making him a younger individual under the regulations. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c) (2012). The record indicates that Lilly has not engaged in substantial gainful activity since the alleged onset date of March 6, 2008.

According to the record, Lilly had been diagnosed with degenerative disc disease in 2002 and with Graves' disease in 1995. A 2006 MRI revealed a broad-based annular bulge in his spine, and an X ray showed moderate disc space narrowing. (R. at 226-27.) Faisal W. Chaudhry, M.D., treated Lilly for back pain in 2006 and noted paravertebral muscle spasms, ataxia, and leg radiculitis stemming from degenerative joint disease of the lumbar spine. (R. at 258-61.) A 2006 X ray revealed disc space narrowing, vacuum disc phenomenon, and small endplate osteophytes. (R. at 236.) Another MRI revealed "mild bilateral foraminal stenosis from a mild broad-based disc bulge" and "significant disc degeneration with a broad-based disc bulge and mild facet hypertrophy result[ing] in mild to moderate left foraminal stenosis." (R. at 243.) Lilly underwent a foraminal laminotomy at the University of Virginia Medical Center in 2006 to remedy nerve compression. (R. at 246.) Throughout 2006, Lilly regularly complained of back pain and was prescribed a variety of pain relievers, both narcotic and non-narcotic, as well as muscle relaxers and physical therapy.

Lilly visited Warren A. Chang, M.D., on December 6, 2007. Dr. Chang was alarmed that Lilly had not been taking any of his medications for several days, but noted that "he currently has no symptoms and says he has been doing well." (R. at 269.) Lilly appeared to be in no acute distress, though mild to moderate exophthalmos was noted. Lilly did not appear to be anxious or depressed. Dr. Chang gave Lilly samples of his Graves' disease medication and warned him of the risk of myxedema coma. He recommended that Lilly use Lubriderm at night and tape his eyelids closed while he sleeps to ease exophthalmos symptoms. Lilly requested a refill of Lortab for back pain, but Dr. Chang noted that Lilly had been issued a "no narcotic letter" and refused to refill the prescription. (R. at 270.)

On June 10, 2008, Dr. Chang again noted that Lilly "has been doing well and has had no major complaints other than his eyes have been bothering him a little more than usual." (R. at 272.) Once again, Lilly was not in acute distress and was not anxious or depressed. On June 25, 2010, Lilly again complained of back pain and Dr. Chang provided samples of non-narcotic pain relievers. Lilly's exophthalmos was significant. (R. at 275.)

On August 27, 2008, Lilly sought treatment of his back pain from Matthew Sykes, a nurse practitioner. Sykes noted that a little more than a year before, Lilly had fallen through a ceiling while doing construction work. (R. at 301.) A straight leg raising test and a FABER test were both positive. Sykes administered an

injection of lidocaine and betamethosone and prescribed Relafen and Lortab.  He noted, "I have known Gary for many years and he is a trustworthy individual.  He definitely needs medication for pain relief."  (R. at 302.)  On September 24, 2008, and again on October 24, 2008, straight leg raise was positive, and Sykes prescribed Relafen, Motrin and Lortab and recommended use of ice and heat to ease pain.  (R. at 299, 300.)  Sykes wrote a letter on November 4, 2008, opining that Lilly was medically unable to sit for jury duty.  (R. at 323.)  Lilly continued to visit Sykes throughout 2009 and received injections and prescriptions for pain relievers and anti-anxiety medication.  (R. at 313-319, 322.)  Beginning in May 2009, Sykes also prescribed Klonopin for situational anxiety.  (R. at 316, 399.)

In January 2009, Dr. Chang noted that Lilly was experiencing symptoms of depression and referred him to a psychologist.  (R. at 373-74.)  Dr. Chang opined that Lilly's thyroid condition might be contributing to his depression symptoms.  Straight leg raising was normal, and Dr. Chang noted only minimal tenderness in Lilly's lower back.  (R. at 373.)  Dr. Chang recommended a follow-up visit in six months.  (R. at 372.)

Lilly began attending group therapy sessions in March 2009.  On intake, Rebecca Holmes, a licensed professional counselor, diagnosed major depression (recurrent, moderate) and assigned Lilly a global assessment of functioning

("GAF") score of 55.[2]  (R. at 363.)  His behavior was described as talkative, warm, and cooperative; his attention and concentration were intact, as were his judgment and insight; and his production and continuity of thought were normal.  (R. at 361.)  Throughout the next year, Lilly's GAF scores ranged from 60 to 65.  (R. at 328, 328, 330, 332-34, 336, 377, 379.)  On March 23, 2009, counselor Jeff Phillips indicated that Lilly exhibited no depression and only mild anxiety.  (R. at 351.)  On April 20 and again on May 4, Phillips noted no depression and no anxiety.  (R. at 345, 347.)  The counselor's progress notes reference a vacation to Memphis (R. at 330-32) as well as a fishing trip (R. at 333).  Lilly attended group therapy through April 2010.  On April 7, 2010, he received a GAF score of 59 (R. at 376.) and on April 27, his score was 61 (R. at 375.).

In May 2009, Lilly was examined by Thomas Cantwell, M.D., a psychologist.  Dr. Cantwell diagnosed depression, multiple factors and prescribed Paxil.  (R. at 339.)  In July 2009, Dr. Cantwell noted that unlike in May, Lilly did not seem to be depressed but rather grieving the recent loss of his stepfather.  (R. at

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination.  It is made up of two components: symptom severity and social occupational functioning.  A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social or occupational functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning.  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

338.)  In October 2009, Dr. Cantwell reported that Lilly was "holding his own." (R. at 337.)

In November 2009, Lilly returned to Dr. Chang, who noted that Lilly's depression status was stable on Paxil.  (R. at 369.)  Lilly showed moderate exophthalmos but reported only some blurred vision in the morning.  (R. at 370.)  Straight leg raising test was normal.  (R. at 370.)

In December 2009, Lilly again visited Sykes, who noted diffuse paralumbar tenderness and spasm.  Sykes stated in his notes, "I currently feel (as I have always felt since I have been taking care of Mr. Lilly) that he is incapable of gainful employment due to his polyarthritic problems and significant other medical problems."  (R. at 397.)

In February 2010, John W. Ludgate, Ph.D., a psychologist, evaluated Lilly.  Ludgate observed that Lilly was cooperative and pleasant, but "appeared to be in quite a bit of pain and was noted to move around a great deal during the interview."  (R. at 404.)  Dr. Ludgate diagnosed Lilly with major depression, generalized anxiety disorder, and panic disorde (R. at 404.), and opined that these disorders, along with pain, would prevent Lilly from workin (R. at 406.).

In February 2010, Dr. Cantwell noted that Lilly was improving.  (R. at 381.)  He mentioned that Lilly complained of migraines three to four times per year resulting from Graves disease.  (R. at 381.)

A number of medical professionals provided assessments of Lilly's residual functional capacity ("RFC"). On September 22, 2008, Michael Hartman, M.D., reviewed the medical evidence of record on behalf of the state agency. Dr. Hartman opined that Lilly could lift ten pounds frequently and twenty pounds occasionally; could stand or walk for about six hours in an eight hour workday; could sit for about six hours in an eight hour workday; and had an unlimited ability to push or pull. (R. at 291.) On January 23, 2009, Thomas Phillips, M.D., reviewed Lilly's medical records on behalf of the state agency. Dr. Phillips reached the same conclusions that Dr. Hartman had reached. (R. at 307.)

On November 3, 2009, Sykes opined that Lilly could carry ten pounds frequently and twenty pounds occasionally; could stand/walk for fifteen minutes without interruption and for one and a half hours total in an eight hour day; and could sit for thirty minutes without interruption and for two to three hours total in an eight hour day. (R. at 325-26.) Sykes indicated that Lilly should never climb, stoop, or kneel, but could occasionally balance, crouch, and crawl. His impairments affected his ability to handle, feel, and push/pull, but his impairments did not affect his ability to reach, see, hear, or speak. (R. at 326.) According to Sykes, Lilly would need to avoid heights, moving machinery, temperature extremes, chemicals, humidity, and vibrations. (R. at 327.)

On April 7, 2010, Jeff Phillips rated Lilly's ability to make occupational adjustments as poor in every category (R. at 392.) and similarly rated his ability to make performance adjustments as poor in every category, (R. at 393.). Phillips indicted that Lilly had a fair ability to maintain his personal appearance, behave in an emotionally stable manner, and demonstrate reliability, but had poor ability to relate predictably in social situations. (R. at 393.) Phillips opined that Lilly would have to miss more than two days of work per month due to his impairments, commenting that he "most likely would have difficulty working any days a month [due to] mental health [and] physical issues." (R. at 394.)

On April 14, 2010, Dr. Cantwell indicated that Lilly had good ability to understand, remember, and carry out job instructions, maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (R. at 421.) According to Dr. Cantwell, Lilly had unlimited ability to follow work rules, relate to coworkers, deal with the public, use judgment with the public, interact with supervisors, and function independently, but poor ability to deal with work stresses and maintain attention and concentration. (R. at 420.) Dr. Cantwell stated that Lilly's "disability is mostly related to medical condition, Graves' disease, and its sequellae [sic] which are severely disabling, especially vision and neurological sequellae [sic]." (R. at 422.)

On May 7, 2010, Dr. Ludgate opined that Lilly's ability to function independently was good; his ability to follow work rules, use judgment with the public, interact with supervisors, and maintain attention and concentration was fair; and his ability to relate to coworkers, deal with the public, and deal with work stresses was poor due to his depression and anxiety. (R. at 407.) Dr. Ludgate indicated that Lilly had fair ability to understand, remember, and carry out simple job instructions, but poor ability to understand, remember, and carry out complex or detailed instructions. He had good ability to maintain his personal appearance and demonstrate reliability, but only fair ability to relate predictably in social situations, and his ability to behave in an emotionally stable manner was poor. (R. at 408.) Dr. Ludgate indicated that Lilly would miss more than two days of work per month due to his impairments. (R. at 409.)

At the hearing, Lilly testified that he suffers from regular headaches due to his Graves' disease as well as significant back pain. (R. at 43.) He rests most of the day, stating, "I don't do very much at all." (R. at 46, 50.) He must wear sunglasses during the day, experiences double vision every morning, and cannot drive at night because the lights cause migraine headaches. (R. at 46, 51.) He testified that he experiences insomnia and depression stemming from his physical and financial difficulties. (R. at 47.) He lives with his mother and does not do many chores other than taking out the trash. (R. at 50.)

Robert Jackson, a VE, testified that a person with the RFC described by the ALJ would not be able to perform Lilly's past relevant work. (R. at 55-56.) However, the VE indicated that Lilly, with an RFC for light, unskilled work, would be able to work as a cleaner, packer, or cashier, and all of those positions exist in significant numbers in the national economy. (R. at 56-57.)

The ALJ found that Lilly suffered from the severe impairments of degenerative disc disease, Graves' disease, and headaches. He concluded that Lilly's mental health problems did not constitute a severe impairment. The ALJ largely discounted the assessments by Dr. Ludgate, Jeff Phillips, and Dr. Cantwell, finding that they were not consistent with the treatment records and reported activities of daily living. The ALJ also noted that Jeff Phillips, as a counselor, and Sykes, as a nurse practitioner, were not acceptable medical sources. According to the ALJ, Lilly had only mild limitation in the areas of daily living, social functioning, and concentration, persistence, or pace, and Lilly had experienced no episodes of decompensation. Thus, the ALJ concluded that Lilly's mental impairments were nonsevere. The ALJ found that none of Lilly's impairments met or medically equaled a listed impairment.

The ALJ further concluded that Lilly had the RFC to perform light work with some restrictions. He would need to avoid night time work in the dark with bright lights and work that required operating a vehicle. He would also need to

avoid concentrated exposure to vibration and any exposure to hazardous machinery and heights. The ALJ found Lilly's statements concerning his symptoms to be only partially credible. Although Lilly could not perform his past relevant work and had no transferrable skills, the ALJ found that Lilly could perform certain jobs that exist in significant numbers in the national economy. Therefore, the ALJ held that Lilly was not disabled as defined by the Act.

Following the ALJ's decision, Lilly submitted additional evidence to the Appeals Council, including letters from himself, his mother, Jeff Phillips, and Dr. Cantwell. The Appeals Council incorporated this new evidence into the record but found it did not provide any basis for changing the ALJ's decision.

Lilly argues that the ALJ's decision is not supported by substantial evidence. For the following reasons, I disagree.

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process.  The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or medically equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2012).  The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy.  *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

I must review the denial of benefits under the Act to ensure that the ALJ's findings of fact "are supported by substantial evidence and [that] the correct law was applied."  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  I must not reweigh the evidence or make credibility determinations because those

functions are left to the ALJ. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id*. (alteration in original) (internal quotation marks and citation omitted).

In this case, Lilly submitted additional evidence to the Appeals Council following the ALJ's decision, which the Appeals Council incorporated into the record. The Appeals Council, and this court, must consider new and material evidence submitted after the ALJ's decision that is relevant to the period on or before the date of the ALJ's decision. 20 C.F.R. § 416.1470(b) (2012); *see Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (holding that where Appeals Council considers additional evidence and incorporates it into the record, reviewing court must also consider the new evidence as part of the record.). This means that I must review the ALJ's decision in light of evidence that the ALJ never considered, *see Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999), while also refraining from making factual determinations, *McGinnis v. Astrue*, 709 F. Supp. 2d 468, 471 (W.D. Va. 2010). Therefore, my review of the new evidence is limited to determining whether it "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports." *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (internal quotation marks and citations omitted). If

the new evidence creates a conflict, then a remand is warranted so that the Commissioner can weigh and resolve the conflicting evidence. *Id.*

Lilly first argues that the ALJ erred in failing to find a severe mental impairment. "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks, citation, and alterations omitted). The record contains a great deal of conflicting evidence regarding Lilly's alleged depression and anxiety and the extent of any impairment caused by those mental conditions. As noted above, it is the ALJ's job to resolve conflicts in the record. The ALJ thoroughly reviewed all of the evidence concerning Lilly's mental impairments and provided detailed reasoning for why he weighed the evidence as he did. It is not my role to reweigh the evidence. I find that substantial evidence supports the ALJ's conclusion that Lilly's depression and anxiety do not constitute a severe impairment.

Lilly next contests the ALJ's decision on the ground that the ALJ failed to give proper weight to the opinions of Dr. Cantwell and Jeff Phillips, both of whom treated Lilly, and Dr. Ludgate, who evaluated Lilly. An ALJ is required to weigh medical opinions based on: "(1) whether the physician has examined the applicant,

(2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson,* 434 F.3d. at 654 (citing 20 C.F.R. § 404.1527). While "[c]ourts often accord greater weight to the testimony of a treating physician," *id.* (internal quotation marks and citation omitted), the ALJ is not required to do so "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [he or she] give[s] [the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2012).

I find that the ALJ was not required to give controlling weight to the assessments of Dr. Cantwell, Jeff Phillips, and Dr. Ludgate because, as the ALJ explained in his decision, the opinions of these three professionals were inconsistent with other substantial evidence in the record. In many cases, the opinions offered by these professionals were contradicted by their own treatment notes, which revealed a much lower level of impairment due to depression and anxiety. The ALJ thoroughly explained his reasons for discounting each

assessment. The ALJ's assignment of little weight to these assessments is supported by substantial evidence.

Finally, Lilly argues that the ALJ erred by rejecting the assessments of Jeff Phillips and Sykes on the ground that these providers were not proper medical sources. "Acceptable medical sources" include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a) (2012). An ALJ may, but is not required to, consider evidence from other sources to determine the severity of a claimant's impairments and the extent to which those impairments affect the claimant's ability to work. *Id.*

I find that while the ALJ could have credited the opinions of Jeff Phillips and Sykes as other medical sources in determining the severity of Lilly's impairments, he was not required to do so, and he did not err in discounting those assessments. Moreover, the ALJ provided several other reasons for why he afforded little weight to the opinions of Jeff Phillips and Sykes, including that their opinions were contradicted by other evidence in the record. I find that substantial evidence supports the ALJ's decision to give little weight to the opinions of Jeff Phillips and Sykes.

Lastly, I find that the evidence submitted to the Appeals Council following the ALJ's decision is largely cumulative and does not create a conflict. Thus, this newly proffered evidence does not warrant a remand.

## IV

For the foregoing reasons, I find that the Commissioner's decision is supported by substantial evidence. The plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: April 1, 2013

/s/  James P. Jones
United States District Judge